UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

NOEL LANGDON,                                                                                                         Plaintiff,

v.                                         Civil Action No. 3:18-cv-65-DJH

LOUISVILLE METRO GOVERNMENT, et al.,                                          Defendants.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Plaintiff Noel Langdon brings this action against Defendants Louisville/Jefferson County Metro Government, Louisville Metro Department of Corrections, Metro Corrections Director Mark Bolton, Dr. Kevin Smith, and Correct Care Solutions, LLC. (Docket No. 1-3) Langdon alleges that while in the custody of Metro Corrections, he suffered from Defendants' deliberate indifference to his serious medical needs. (*Id.*) The Metro Defendants and Correct Care Solutions move to dismiss the claims against them. (D.N. 3; D.N. 6) Additionally, Dr. Smith moves to partially dismiss the claims against him. (D.N. 5) For the reasons set forth below, the Court will grant Dr. Smith's motion, as well as the Metro Defendants' motion. However, although the Court agrees that Langdon's complaint alleges mostly legal conclusions as to Correct Care Solutions, it also finds that Langdon should be allowed the opportunity to file an amended complaint that better conforms to the federal pleading standard. Accordingly, the Court will deny Correct Care Solutions' motion without prejudice and allow Langdon to file an amended complaint that clarifies his claims against Correct Care Solutions if he so chooses.

1

I.     Background

The following facts are set out in the complaint and accepted as true for purposes of the present motions.[1] *See Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009).

This action arises out of medical complications that Noel Langdon developed during his incarceration in Louisville Metro Department of Corrections. (D.N. 1-3) Correct Care is a private entity contracted to provide medical services to inmates at LMDC. (*Id.*, PageID # 13) Defendant Dr. Kevin Smith is "an employed [p]hysician of LMDC." (*Id.*)

On July 3, 2016, Langdon began his incarceration at LMDC. (*Id.*, PageID # 14) While playing basketball in the Jail's gym one day, Langdon injured himself, resulting in a hernia. (*Id.*) The hernia eventually developed into a "golf ball sized . . . movable mass [in his] upper pubic region." (*Id.*, PageID # 15) Concerned with the mass, Langdon submitted several healthcare-request forms to Jail personnel, indicating his severe pain.[2] (*Id.*) Although Dr. Smith—who oversaw Langdon during his incarceration at LMDC—prescribed Langdon narcotic pain relievers (*id.*, PageID # 16), because the medicine was occasionally unavailable due to limited stock, Langdon's only recourse in some instances was generic ibuprofen, which he contends was inadequate in alleviating his pain.[3] (*Id.*, PageID # 15) Additionally, despite Langdon's requests

---

[1] The Court notes that several dates contained in the complaint appear incorrect. (*See, e.g.*, D.N. 1-3, PageID # 15 ("[Langdon] was nonetheless denied adequate medical treatment from July 26, 2017 until January 10, 2017."); *see also id.*, PageID # 14 ("Langdon . . . was released from incarceration on January 10, 2017 . . . . While incarcerated, Mr. Langdon suffered a hernia while playing basketball in the facility's gym on or about July 26, 2017.")) The Court has attempted to infer the correct dates at issue.
[2] Langdon also claims that he filed grievances with the Jail, the majority of which went unanswered. (D.N. 1-3, PageID # 17–18)
[3] Langdon's complaint is unclear on this point. At times, Langdon insinuates that he never had access to the prescribed medications. (D.N. 1-3, PageID # 16) However, elsewhere in his complaint, Langdon contends that CCS failed to adequately treat his constipation, which was caused by his use of "ibuprofen, acetaminophen, and tramadol," the latter of which is one of the

2

to the contrary, Dr. Smith concluded that surgery was unnecessary. (*Id*.) In fact, he apparently refused to provide Langdon medical treatment on one occasion. (*Id*., PageID # 16)

Langdon also alleges that because of overcrowding, LMDC forced him to sleep on the floor on a single mattress. (*Id*., PageID # 17) He also explains that LMDC assigned him to spend 40 days of his incarceration in an area known as "Headquarters," which, according to Langdon, is infested with black mold and asbestos. (*Id*.) As a result of these conditions, Langdon's hernia worsened and he developed difficulty breathing and spotty vision. (*Id*.)

Langdon's hernia eventually escalated to a complete perforation by January 2017, when his incarceration at LMDC ended. (*Id*.) In June 2017, Langdon sought medical treatment at Shawnee Christian Health in Louisville, Kentucky. (*Id*., PageID # 18) The doctor referred Langdon for urgent hernia surgery. (*Id*.) The surgery took place on September 14, 2017 at Norton Healthcare. (*Id*.) Langdon alleges that Defendants' failure to timely refer him for surgery resulted in various medical ailments. (*Id*.)

In January 2018, Langdon brought this action against Louisville Metro Government, LMDC, LMDC Director Mark Bolton, Correct Care Solutions (CCS), and Dr. Kevin Smith. Langdon alleges that Defendants were deliberately indifferent to his medical needs in violation of his constitutional rights. (*Id*., PageID # 19) He also contends that Defendants violated the Kentucky tort of outrage. (*Id*., PageID # 20) Additionally, Langdon alleges municipal and supervisory liability under 18 U.S.C. § 1983 against the Metro Defendants and CCS. (*Id*., PageID # 21) CCS and the Metro Defendants move to dismiss Langdon's claims against them. (D.N. 3; D.N. 6) Dr. Smith moves to partially dismiss the claims against him. (D.N. 5)

---

prescribed narcotics at issue. (*Id*.) Accordingly, the Court will assume that Langdon means to allege that his prescriptions were periodically unavailable during his incarceration.

## II. Standard

In order to avoid dismissal for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the plaintiff has not shown that he is entitled to relief. *Id*. at 679. The complaint need not contain "detailed factual allegations," but it must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. at 678 (citing *Twombly*, 550 U.S. at 555). "Although for the purposes of a motion to dismiss [the Court] must take all of the factual allegations in the complaint as true, [the Court is] not bound to accept as true a legal conclusion couched as a factual allegation." *Id*. (citing *Twombly*, 550 U.S. at 555). Furthermore, "[w]hile a complaint will survive a motion to dismiss if it contains either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory . . . legal conclusions masquerading as factual allegations will not suffice." *Phila. Indem. Ins. Co. v. Youth Alive, Inc.*, 732 F.3d 645, 649 (6th Cir. 2013) (internal quotations omitted).

## III. Discussion

**A. Dr. Smith's Partial Motion to Dismiss**

In support of his partial motion to dismiss, Dr. Smith argues that Langdon may not proceed with his outrage claim because "Kentucky law does not permit a claim of outrage or intentional infliction of emotional distress to stand when Plaintiff has redress through a traditional tort such as negligence." (D.N. 5-1, PageID # 49 (citing *Banks v. Fritsch*, 39 S.W.3d 474, 481 (Ky. Ct. App. 2001))) Smith is correct that "[w]here an actor's conduct amounts to the commission of one of the traditional torts . . . and the conduct was not intended only to cause

extreme emotional distress in the victim, the tort of outrage will not lie." *Barnes v. Stratton*, No. 3:16-cv-214-DJH, 2017 WL 903468, at *7 (W.D. Ky. Mar. 7, 2017) (quoting *Banks*, 39 S.W.3d at 480). Thus, "a plaintiff cannot maintain *both* a negligence claim and an [outrage] claim based on a single set of facts." *Childers v. Geile*, 367 S.W.3d 576, 581 (Ky. 2012) (emphasis in original). The Court must eventually inquire "whether the facts support simple or gross negligence leading to a personal injury, some other specific intent tort, or a claim that conduct was intended or the actor should have known was likely to cause emotional distress with any physical results being consequential." *Id*.

Accordingly, "the notion that intentional infliction of emotional distress is a gap-filler tort is correct"; however, "[t]his is not to say that it cannot be pleaded alternatively." *Id*. at 582; *see also Kustes v. Lexington-Fayette Urban Cty. Gov't*, No. 5:12–323, 2013 WL 4776343, at *2 (E.D. Ky. Sept. 3, 2013) ("A plaintiff can, however, plead an IIED claim in the alternative to a traditional tort claim."). This Court's opinion in *Burke v. Thompson*, No. 5:15-CV-00007-TBR, 2016 WL 2587996 (W.D. Ky. May 4, 2016), is instructive:

> Plaintiff has alleged that the defendants intentionally caused severe emotional distress. While the facts of this case may also support Plaintiff's claims for negligence, it may be that certain defendants acted only with an intent to cause emotional harm. At this early stage, the plaintiff's assertions must be assumed true. Accordingly, the Court will permit Plaintiff's outrage claim to proceed at this stage of the proceedings.

*Id*. at *9 (internal alteration, citation, and quotations omitted). Thus, the mere fact that Langdon has alleged both a deliberate-indifference claim and an outrage claim is not grounds for dismissal of his outrage claim. (*See* D.N. 1-3)

However, to proceed with his outrage claim, "[Langdon] must allege facts sufficient to show that: (1) the defendant's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable, in that it offends the generally accepted standards of decency and

5

morality; (3) there was causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe." *Bailey v. Aramark Corp.*, No. 16-343-JMH, 2017 WL 3841687, at *4 (E.D. Ky. Sept. 1, 2017) (citing *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 788 (Ky. 2004)). Regarding the second element, the standard for "outrageous and intolerable conduct" is stringent. "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 3 (Ky. 1990) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

In his complaint, Langdon claims that Dr. Smith committed the tort of outrage "by denying simple concessions for comfort, disregarding formal grievances, and placing [him] in Headquarters." (D.N. 1-3, PageID # 20) However, as to the factual assertions against Dr. Smith, Langdon explains: (i) a CCS nurse notified Dr. Smith of Langdon's mass and he merely prescribed a narcotic pain reliver; (ii) despite knowledge of Langdon's growing mass, Dr. Smith failed to refer Langdon to surgery; and (iii) on October 22, 2016, Dr. Smith told Langdon, "I'm refusing you medical treatment." (*Id.*, PageID # 15–16) These facts fail to raise a plausible inference that Dr. Smith's conduct was "outrageous and intolerable." The first two facts at best describe negligent conduct. *Childers*, 367 S.W.3d at 580 ("[I]t is logical to say that simple negligent conduct cannot give rise to the tort of intentional infliction of emotional distress, because the tortfeasor does not have the requisite mental state."). And the mere fact that Dr. Smith refused to provide medical treatment to Langdon on one occasion, without more, does not plausibly indicate outrageous conduct. *See Smith v. Rees*, No. 5:07–CV–00180–R, 2011 WL 5025358, at *7 (W.D. Ky. Oct. 21, 2011) ("After Plaintiff's heart attack, he received medication

and follow-up treatment, but because it was not the type that he wanted or thought appropriate, Smith claims that IIED was committed on him by Dr. Hiland. Neither Dr. Hiland's failure to examine a prisoner who refused examination nor Dr. Hiland's selected course of treatment was 'outrageous or intolerable.'"); *see generally Hines v. Hiland*, No. 5:09–CV–00075–R, 2011 WL 2580350, at *4 (W.D. Ky. June 28, 2011) ("Taking the facts in the most favorable light to Hines and assuming that Hiland provided inadequate medical care, an improper diagnosis can scarcely be held as extreme or outrageous conduct, especially in light of *Stringer*'s high standard."). Put differently, Langdon fails to provide any factual context to indicate that Dr. Smith's refusal went "beyond all possible bounds of decency." *Seitz*, 796 S.W.2d at 3.

Langdon has therefore failed to plausibly allege an outrage claim as to Dr. Smith. The Court will grant Dr. Smith's partial motion to dismiss.

## B. Correct Care Solutions' Motion to Dismiss

In support of its motion to dismiss, CCS first argues that Langdon failed to exhaust his administrative remedies. (D.N. 3-1, PageID # 31–32) CCS is correct that pursuant to the Prison Litigation Reform Act, "exhaustion of available administrative remedies is required for any suit challenging prison conditions." *Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *see also* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). However, Langdon's complaint implies that at the time he filed this action, he was no longer incarcerated.[4] (*See* D.N. 1-3, PageID # 14) He thus had no obligation to exhaust administrative remedies. *See Smith v. Franklin Cty.*, 227 F. Supp. 2d 667, 676 (E.D. Ky. 2002) ("Plaintiff was not a prisoner at the

---

[4] Although CCS proceeds as if Langdon is currently incarcerated, for purposes of the present motion, the Court must take Langdon's assertions as true. *See Iqbal*, 556 U.S. at 678.

time she filed her Complaint . . . . It follows that Plaintiff was not a 'prisoner' subject to the requirements of the PLRA . . . and her federal § 1983 and ADA claims are not thusly barred."); *see also Chapman v. Knight*, No. 1:09CV–00092–JHM, 2010 WL 3001708, at *4 (W.D. Ky. July 27, 2010) ("[T]he PLRA does not require Chapman to exhaust her administrative remedies before filing this lawsuit because she was not a 'prisoner' when she filed this lawsuit.").

CCS also argues that Langdon fails to allege facts indicating its liability under § 1983. (D.N. 3-1, PageID # 28–30) "Private corporations that 'perform a traditional state function such as providing medical services to prison inmates may be sued under § 1983 as one acting under color of state law.'" *Rouster v. Cty. of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014) (quoting *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996)). "However, private corporations cannot be held liable on the basis of respondeat superior or vicarious liability." *Id*. Thus, to hold CCS liable, Langdon must allege "both that his . . . constitutional rights were violated and that a policy or custom of the [corporation] was the 'moving force' behind the deprivation of [his] rights." *Id.* (quoting *Miller v. Sanilac Cty.*, 606 F.3d 240, 254–55 (6th Cir. 2010)); *see also Harris v. Goins*, 156 F. Supp. 3d 857, 863 (E.D. Ky. 2015) ("[P]laintiff must allege that a policy or custom of the defendant corporation caused the deprivation at issue.").

Langdon presents three theories upon which he seeks to hold CCS liable under § 1983. More precisely, he alleges that CCS is liable due to its failure:

> (a) to adequately train and supervise its Medical Staff, (b) to adequately and properly staff and provide the resources necessary to serve the needs of persons like [him], and (c) to inculcate policies, customs and practices to prevent (or to investigate, discover and change or abolish the policies, customs and practices responsible for) the mistreatment [he] endured.

(D.N. 1-3, PageID # 21) Yet, as CCS maintains, Langdon provides little factual support for his assertions. As to CCS specifically, he alleges: "Although [he] was once prescribed Tylenol-3 to

8

help with the pain, he never received the medicine . . . due to unavailability," and on other occasions, prescriptions "were not properly stocked in order to supply [him] with adequate treatment." (D.N. 1-3, PageID # 16) The Court agrees with CCS that Langdon fails to set forth specific facts indicating that the unavailability of his medications stemmed from a CCS custom or policy. Nevertheless, because leave to amend a complaint should be freely given when justice so requires, and because Langdon asserts enough facts indicating the possibility that CCS has a custom or policy addressing the availability of medications, the Court will deny CCS's motion without prejudice and grant Langdon the opportunity to amend. *See* Fed. R. Civ. P. 15(a)(2); *Kottmyer v. Maas*, 436 F.3d 684, 692 (6th Cir. 2006). "[C]ourts have consistently held that leave to amend may be granted without a formal motion." *Feuerstein v. Simpson*, 582 F. App'x 93, 97 n.3 (3d Cir. 2014); *see also NVZ Capital, LLC v. Gentry*, No. 7:12–105–KKC, 2013 WL 526749, at *2 (E.D. Ky. Feb. 11, 2013) ("Therefore, on its own motion, this Court will grant [the plaintiff] leave to amend its complaint."); *Straker v. Metro. Transit Auth.*, 333 F. Supp. 2d 91, 102 (E.D.N.Y. 2004) ("[T]he Court may *sua sponte* grant leave to amend a complaint."). Leave to amend is especially appropriate when the complaint was originally filed in state court and thus not written to satisfy the federal pleading standard. *See, e.g.*, *Robinson v. Chuy's Opco, Inc.*, No. 1:17-CV-123, 2017 WL 4247547, at *2 (S.D. Ohio Sept. 25, 2017) (granting the plaintiff leave to amend a complaint originally filed in state court so he could conform it to federal pleading standards); *McKee v. Am. Brokers Conduit*, No. 12-2406-STA-tmp, 2013 WL 11765826, at *4 (W.D. Tenn. Jan. 4, 2013) (same). Here, Langdon originally filed this action in state court. (D.N. 1-3) The Court will therefore grant Langdon the opportunity to amend his complaint as to his allegations against CCS.

**C. Louisville Metro's Motion to Dismiss**

As to his § 1983 claim against Louisville Metro, Langdon must eventually demonstrate that the alleged federal violation occurred because of a municipal policy or custom.[5] *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Thus, to proceed with his municipal-liability claim, Langdon must present sufficient "factual content that allows the [C]ourt to draw the reasonable inference" that his injuries occurred as a result of a Louisville Metro custom or policy. *Iqbal*, 556 U.S. at 678.

In his complaint, Langdon states that

> Louisville Metro . . . fail[ed] . . . to adequately train and supervise the Jail's officers, employees, and Medical Staff . . . to adequately and properly staff the Jail and provide it the resources necessary to serve the needs of persons like [him], and . . . to inculcate policies, customs and practices to prevent – or to investigate, discover, and change or abolish the polices, customs and practices responsible for – the mistreatment [he] endured.

(D.N. 1-3, PageID # 21) First, to hold Louisville Metro liable for a "failure to train," Langdon must allege facts indicating prior "similar constitutional violations by [Louisville Metro's] untrained employees" or, at the very least, a single incident of unconstitutional behavior alongside allegations that Louisville Metro failed to train its employees "to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 738–39 (6th Cir. 2015) (internal quotations omitted). Langdon fails to set forth facts indicating either situation is present here. (*See* D.N. 1-3) He does not allege prior instances of misconduct on the part of Louisville Metro employees; and, although he claims unconstitutional conduct on the part of Dr. Smith regarding the treatment at issue, the complaint

---

[5] Although Langdon asserts claims against LMDC, he concedes in his response to the Metro Defendants' motion that LMDC is incapable of being sued and that Louisville Metro is the correct party. (D.N. 10, PageID # 87) *See also Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). Accordingly, the Court will dismiss LMDC from this action.

contains no facts plausibly indicating that Louisville Metro's training was "so reckless or grossly negligent that future . . . misconduct is almost inevitable or would properly be characterized as substantially certain to result." *Harvey v. Campbell Cty., Tenn.*, 453 F. App'x 557, 562–63 (6th Cir. 2011). In other words, the complaint does not plausibly indicate that Dr. Smith's alleged constitutional violation was "closely related to" or "actually caused" by a failure to train on the part of Louisville Metro. *City of Canton v. Harris*, 489 U.S. 378, 390–91 (1989).[6]

Moreover, "only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants" can it be held liable under § 1983. *Brown v. Chapman*, 814 F.3d 447, 463 (6th Cir. 2016) (quoting *City of Canton*, 489 U.S. at 389 (alternation omitted)). Langdon fails to provide any facts to support his claim beyond a "formulaic recitation" that Louisville Metro acted with deliberate indifference. This Court and others within this Circuit have consistently dismissed such bare-bones assertions of municipal liability. *See Phillips v. PTS of Am., LLC*, No. 3:17-cv-00603-JHM, 2017 WL 4582801 (W.D. Ky. Oct. 13, 2017); *Sollenberger v. Sollenberger*, 173 F. Supp. 3d 608 (S.D. Ohio 2016); *Flanigan v. Cty. of Oakland*, No. 15-12504, 2016 WL 304763 (E.D. Mich. Jan. 26, 2016); *Okolo v. Metro. Gov't of Nashville*, 892 F. Supp. 2d 931 (M.D. Tenn. 2012). Therefore, Langdon may not proceed with his failure-to-train theory of liability.

Second, to succeed on his failure-to-promulgate theory, Langdon must eventually show that Louisville Metro's "failure to establish policies . . . itself amounted to a 'policy or custom' that reflected a 'deliberate choice to follow a course of action.'" *Gailor v. Armstrong*, 187 F. Supp. 2d 729, 732 (W.D. Ky. 2001) (quoting *Harris*, 489 U.S. at 388–89). In his complaint, Langdon fails to assert facts plausibly indicating that Louisville Metro deliberately chose to not

---

[6] Langdon admits, for example, that Dr. Smith relied on ultrasounds to reach his conclusion that a "referral for surgery [was] not indicated." (D.N. 1-3, PageID # 15)

11

enforce or establish policies pertaining to inmates' medical treatment. (*See* D.N. 1-3) Langdon's omission is grounds for dismissal of his failure-to-promulgate theory. *See Dishman v. Correct Care Solutions, LLC*, No. 17-98-HRW, 2018 WL 3097319, at *5 (E.D. Ky. June 22, 2018) ("As for CCS' alleged failure to promulgate adequate policies, the Complaint is devoid of any allegations identifying the allegedly deficient policy, how existing policies and procedures are inadequate or otherwise place inmates' serious medical needs at risk, or CCS' awareness of the deficiency in existing policy and the risk it posed."); *Fuller v. Louisville Metro Gov't*, No. 3:17-cv-661-DJH, 2018 WL 3058883, at *5 (W.D. Ky. June 20, 2018) ("[The plaintiff fails] to state a factual background pertaining to Louisville Metro's alleged failure to promulgate policies."); *Bradford v. Bracken Cty.*, No. 09-115-DLB, 2010 WL 11520681, at *4 (E.D. Ky. Feb. 1, 2010) ("Plaintiffs' Complaint in conclusory fashion asserts that [the defendants] 'failed' to establish and enforce policies . . . without stating any facts to support the allegations.").[7]

As to his claim concerning his stay in "Headquarters," Langdon fails to state a plausible claim for relief. As noted above, Langdon alleges that he spent 40 days of his incarceration in an area of the Jail known as Headquarters, which contained "extreme filth [and] an infestation of cockroaches." (D.N. 1-3, PageID # 17) Langdon also "*suspects* he was subjected to harmful agents including, but not limited to black mold and asbestos." (*Id.*) As an initial matter, Langdon fails to sufficiently plead an injury in support of his allegations. A speculative injury does not vest a plaintiff with standing. *See Stanfield v. Thompson*, No. 4:12CV–P54–M, 2012 WL 3161293, at *4 (W.D. Ky. Aug. 3, 2012) ("Plaintiff has failed to set forth any physical injury he suffered as a result of the denial of the requested hygiene items and insufficient meals at the

---

[7] Nor can Langdon's alleged unaddressed grievances support his claim, as the Sixth Circuit has held that "there is no constitutionally protected due process right to unfettered access to prison grievance procedures." *Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005).

institution. 'A speculative injury does not vest a plaintiff with standing.'" (quoting *King v. Deskins*, No. 99-6381, 2000 WL 1140760, at *2 (6th Cir. Aug. 8, 2000))).

Nor do Langdon's alleged "spotty vision" or "difficulty breathing" state a sufficient injury to sustain his § 1983 claim. *Bey v. Luoma*, No. 2:06-cv-243, 2009 WL 884630, at *3 (W.D. Mich. 2009) (finding no constitutional violation when a prisoner claimed that the smell of human feces subjected him to a grave health risk even though the prisoner alleged that he experienced nausea, migraine headaches, nosebleeds, difficulties breathing, and pain and suffering); *see also Quinlan v. Pers. Transp. Servs. Co., LLC*, 329 F. App'x 246, 249 (11th Cir. 2009) (finding temporary chest pain, headache, difficulty breathing, and back pain during transport van ride no more than de minimis injury which barred § 1983 claim); *Vasquez v. Frank*, 290 F. App'x 927, 929 (7th Cir. 2008) (holding that ventilation and extremely high temperatures that allegedly caused dizziness, migraines, nasal congestion, nose bleeds, and difficulty breathing did not rise to the level of an Eighth Amendment violation).

In any event, "the complaint contains no factual content upon which the Court could find that [Langdon is] plausibly entitled to relief, such as what [the] policies or customs regarding [Headquarters] were, why they were inadequate, or how they contributed to the violation of [his] constitutional rights." *Phillips, LLC*, 2017 WL 4582801 at *2. Although the Court has permitted similar allegations, in those actions, the plaintiffs identified the specific policy at issue. *See Golliday v. Causey*, No. 1:17-CV-P131-GNS, 2017 WL 6393636, at *2 (W.D. Ky. Dec. 13, 2017) ("Plaintiff alleges a WCRJ policy or custom of not issuing sufficient cleaning agents to remove black mold. On initial review, the Court will allow the complaint to continue against Defendants in their official capacities for this claim."); *Peters v. Osborne*, No. 4:14CV–P2–M, 2014 WL 1379340, at *3 (W.D. Ky. Apr. 8, 2014) ("Plaintiff alleges a DCDC policy or custom

of deliberate indifference in its failure to remove the allegedly toxic black mold. On initial review, the Court will allow the complaint to continue against Defendants in their official capacities.").[8] Here, besides conclusory remarks, Langdon fails to allege sufficient facts indicating that a Louisville Metro custom or policy caused the conditions he faced in Headquarters. Moreover, unlike his allegations against CCS, Langdon has provided no factual content upon which the Court could even conclude the possibility that a Louisville Metro custom or policy caused his injuries. Leave to amend is therefore unwarranted.

In sum, the Court will dismiss Langdon's claims against Louisville Metro.[9]

**D. Director Bolton's Motion to Dismiss**

*1. Deliberate Indifference*

As to his claims against Director Bolton, Langdon first alleges that "*all* Medical Staff and Jail Staff denied him adequate treatment and showed a deliberate indifference to the cause of [his] suffering." (D.N. 1-3, PageID # 19 (emphasis added)) Langdon does not clarify which individual "Jail Staff" he refers to and thus it is unclear from the face of his complaint whether he asserts that claim against Bolton. For purposes of the present motion, the Court will construe the complaint as alleging a deliberate-indifference claim against Bolton.

---

[8] Nor may Langdon proceed with his claim concerning his having to sleep on a single mattress during his stay at LMDC. The fact that Langdon had to sleep on the floor on a single mattress does not rise to the level of unconstitutional conduct on the part of Louisville Metro. *See Smith v. Brady*, No. 4:17-CV-P163-JHM, 2018 WL 1787740, at *2 (W.D. Ky. Apr. 13, 2018) ("Plaintiff's allegations that HCDC is crowded, that inmates must eat on the floor and sleep on mats rather than beds, and there is a line to use the restroom are not deprivations of the minimal civilized measure of life's necessities."); *see also Wells v. Jefferson Cty. Sheriff Dep't.*, 35 F. App'x 142, 143 (6th Cir. 2002) (finding no Eighth Amendment violation where inmate slept on mattress on the floor in a cold cell for six days).

[9] In his response brief, Langdon concedes that his state-law claim against Louisville Metro fails as a matter of law pursuant to the doctrine of sovereign immunity. (D.N. 10, PageID # 88) *See also Lexington-Fayette Urban Cty. Gov't v. Smolcic*, 142 S.W.3d 128, 132 (Ky. 2004) ("[U]rban county governments constitute a new classification of county government . . . [and are] entitled to sovereign immunity."). The Court will accordingly dismiss that claim.

"Deliberate indifference requires that the defendants knew of and disregarded a substantial risk of serious harm to [the decedent's] health and safety." *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001). Langdon is required to sufficiently allege both an objective and subjective component. "The objective component requires the existence of a 'sufficiently serious' medical need." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004). "The subjective component requires an inmate to show that prison officials have 'a sufficiently culpable mind in denying medical care.'" *Id.* (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)). "Knowledge of the asserted serious needs, or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Miller v. Calhoun Cty.*, 408 F.3d 803, 813 (6th Cir. 2005) (quoting *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994)).

Langdon's complaint contains no facts upon which the Court could plausibly conclude that Bolton had knowledge of Langdon's medical needs. (*See* D.N. 1-3, PageID # 14–18) Indeed, the "Statement of Facts" section of his complaint fails to even mention Bolton. (*Id.*) This court has consistently dismissed complaints which fail to present sufficient facts to indicate that the correctional director had knowledge of the plaintiff's serious medical needs. *See, e.g.*, *Smith v. Bolton*, No: 3:17-CV-00468-JHM, 2017 WL 5180960, at *2 (W.D. Ky. Nov. 8, 2017) ("But as for the Defendant[] . . . Bolton . . . there are no assertions that [he] had any direct knowledge or involvement in Plaintiff's arrest, detention, alleged excessive force or alleged failure to treat Plaintiff's medical needs."); *Blaine v. Louisville Metro Gov't*, No. 3:13–CV–00427–CRS, 2014 WL 321142, at *2 (W.D. Ky. Jan. 29, 2014) ("As a practical matter, this disposes of Plaintiff's deliberate indifference claim because . . . she has not alleged that

Defendants Conrad and Bolton had direct knowledge of either [the decedent's] confinement or his medical condition.").

Langdon's sole argument in rebuttal is that "Bolton has based his Motion to Dismiss upon factors that are all legitimate questions of fact yet to be affirmed or even vetted through discovery." (D.N. 10, PageID # 90) Langdon misstates his burden, however. At this stage of the proceedings, Langdon is required to allege sufficient "factual content that allows the [C]ourt to draw the reasonable inference" that Bolton had direct knowledge of his serious medical needs. *Iqbal*, 556 U.S. at 678; *see also Miller*, 408 F.3d at 813; *Blaine*, 2014 WL 321142 at *2 ("Plaintiff argues that Defendants' Motion to Dismiss is premature because they 'have been afforded no opportunity to discover the policies, customs, and practices that may have caused [the decedent's] death' . . . . [However,] motions to dismiss are based on allegations contained in the relevant pleadings as opposed to facts developed in discovery." (internal alterations omitted)). Langdon has failed to satisfy his burden. Thus, to the extent that Langdon alleges a constitutional deliberate-indifference claim against Bolton, the Court will dismiss his claim.

2. *Supervisory Liability*

Langdon also seeks to hold Bolton liable in his supervisory capacity. He alleges that his injuries resulted from Bolton's failure "to adequately train and supervise the Jail's officers . . . to adequately and properly staff the Jail . . . [and] to inculcate policies, customs, and practices to prevent . . . the mistreatment [he] endured." (D.N. 1-3, PageID # 21) The Sixth Circuit has "long held that supervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor," and that "a mere failure to act will not suffice to establish supervisory liability." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). Active unconstitutional behavior means that

the supervisor "encouraged the specific incident of misconduct or in some other way directly participated in it." *Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010) (quoting *Cardinal v. Metrish*, 564 F.3d 794, 802–03 (6th Cir. 2009)). At a minimum, a plaintiff must allege that the supervisor "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

In his complaint, Langdon presents no factual content to indicate that Bolton encouraged or directly participated in the officers' conduct or that at a minimum he implicitly authorized, approved, or acquiesced in the conduct. (*See* D.N. 1-3) As explained above, the Complaint contains no facts whatsoever to link Bolton to the incidents at issue. (*See id.*) This court has consistently dismissed claims against supervisory officials where the complaint lacks factual detail connecting the supervisory official to the alleged underlying unconstitutional actions. *See, e.g.*, *Neal v. Bolton*, No. 3:17CV-P496-TBR, 2018 WL 314829, at *3 (W.D. Ky. Jan. 5, 2018) ("Plaintiff fails to allege that Defendant Bolton was actively involved in any of the alleged wrongdoing."); *Martinez v. Bolton*, No. 3:17-cv-P265-DJH, 2017 WL 2989185, at *3 (W.D. Ky. July 13, 2017) ("Thus, because Plaintiff has failed to allege Defendant Bolton engaged in any active unconstitutional conduct, the individual-capacity claim against him will also be dismissed for failure to state a claim upon which relief may be granted."); *Prather v. Corrections Care Sollutions* (sic), No. 3:15CV-P770-JHM, 2016 WL 866356, at *4 (W.D. Ky. Mar. 3, 2016) ("Plaintiff fails to allege that Defendant Director Bolton was actively involved in any of the alleged wrongdoing.").

Because Langdon fails to provide facts plausibly indicating that Bolton's actions constitute "active unconstitutional behavior," the Court will dismiss his supervisory-liability

claims against Bolton.[10] *See Peatross*, 818 F.3d at 241. Having dismissed all claims against Bolton in this action, the Court will terminate him from the present suit.

## IV. Conclusion

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1) Plaintiff Noel Langdon's motion for extension of time to file his response/reply to the pending motions (D.N. 7) is **GRANTED**.

(2) Defendant Correct Care Solutions' motion to dismiss (D.N. 3) is **DENIED** without prejudice. Langdon shall have **twenty-one (21) days** from the date of entry of this Order within which to file an amended complaint that clarifies his claims against CCS.

(3) Defendant Kevin Smith's partial motion to dismiss (D.N. 5) is **GRANTED**. Langdon's outrage claim against Dr. Smith is **DISMISSED** with prejudice. Langdon may proceed with his deliberate-indifference claim against Dr. Smith.

(4) The Metro Defendants' motion to dismiss (D.N. 6) is **GRANTED**.

(5) The Clerk of Court is **DIRECTED** to terminate Louisville Metro, Louisville Metro Department of Corrections, and Director Mark E. Bolton as defendants in the record of this matter.

---

[10] In his response to Director Bolton's motion to dismiss, Langdon concedes that Bolton is immune from liability for his state-law claims. (D.N. 10, PageID # 89) In any event, the complaint contains no facts indicating that Bolton was directly involved in the incidents at issue. The Court will accordingly dismiss Langdon's state-law claims against Bolton. *See Juillerat v. United States*, No. 3:16-cv-00276-TBR, 2016 WL 6156179, at *6 (W.D. Ky. Oct. 21, 2016) ("[A] claim against a public official must contain some allegation that the official was directly involved in the negligent acts of subordinates, otherwise, there is no vicarious liability for the public official." (internal quotations omitted)).

(6) Pursuant to 28 U.S.C. § 636(b)(1)(A), this matter is **REFERRED** to Magistrate Judge Colin H. Lindsay for resolution of all litigation planning issues, entry of scheduling orders, consideration of amendments thereto, and resolution of all nondispositive matters, including discovery issues. Judge Lindsay is further authorized to conduct one or more settlement conferences in this matter.

August 30, 2018

**David J. Hale, Judge**
**United States District Court**